SLR:KAN:ESW
F.#2008V02571

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-10-751**

------------------------------X

In re the Seizure of:

AN AMOUNT OF FUNDS NOT TO EXCEED $345,912.00 HELD AT CITIBANK ACCOUNT NUMBER 3200381849 AND SUNTRUST BANK ACCOUNT NUMBER 1000052795407 IN THE NAME OF TRANSLUCENT COMMUNICATIONS, LLC;

------------------------------X

AFFIDAVIT OF CARMELO LANA IN SUPPORT OF AN APPLICATION FOR <u>SEIZURE WARRANTS</u>

CARMELO LANA, being duly sworn, deposes and says:

1. I am a Special Agent with the United States Department of Homeland Security, Immigration & Customs Enforcement ("ICE"), El Dorado Task Force. I have held the position of Special Agent for approximately eight years. During that time, I have participated in the prosecution of at least one hundred narcotics and money laundering cases, including criminal narcotics enterprises that specialize in the movement of multi-kilograms of cocaine, and the transfers of millions of dollars in drug proceeds to drug sources in the United States, Mexico, Central America and South America.[1] I am currently a member of the El Dorado Task Force (the "Task Force"), which is comprised of federal, state and local law

---

[1] Pursuant to Sections 403 and 412 of the Homeland Security Act of 2002 (Pub. L. 107-296), in conjunction with a Delegation from the Secretary of Treasury (Treasury Order 100-16), certain powers previously held by the U.S. Customs Service, including the power under 18 U.S.C. § 981(b)(1) to seize property subject to forfeiture, were transferred to Department of Homeland Security.

enforcement officers. The Task Force is organized and led by the Department of Homeland Security, Immigration and Customs Enforcement, and it focuses on money laundering investigations. Through my work with the Task Force, I have participated in numerous investigations relating to the laundering of illegal proceeds through the use of structured cash deposits.

2. This affidavit is submitted in support of the United States' request for seizure warrants, pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b), for an amount of funds not to exceed $345,912.00 held at Citibank account number 3200381849 (the "Target Citibank Account") and Suntrust Bank account number 1000052795407 (the "Target Suntrust Account"), both held in the name of Translucent Communications, LLC (collectively the "Target Accounts"). Such funds constitute: (a) property involved in violations of 18 U.S.C. § 1956, and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); (b) property involved in violations of 31 U.S.C. § 5324, and subject to forfeiture pursuant to 31 U.S.C. § 5317; and/or (c) funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. § 881. I have not included each and every fact I know about this investigation in this affidavit. Rather, I am setting forth the facts that are required to establish cause for seizure of funds on deposit in the Target Accounts.

## STATUTORY BACKGROUND

3.      Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, which is involved in a transaction or attempted transaction in violation of federal money laundering laws, 18 U.S.C. § 1956, and any property traceable thereto, is subject to forfeiture to the United States.

4.      Pursuant to 21 U.S.C. § 881(a)(6), all property, real or personal, which constitutes or is derived from proceeds traceable to the sale of a controlled substance or was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the sale of a controlled substance, is subject to forfeiture to the United States.

5.      Pursuant to 31 U.S.C. § 5317(c), any property involved in a violation of 31 U.S.C. § 5324 (structuring), or any conspiracy to commit any such violation, and any property traceable to such property, is subject to forfeiture to the United States.

6.      This Court is empowered to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981, 31 U.S.C. § 5317 and 21 U.S.C. § 881 by 18 U.S.C. § 981(b), 31 U.S.C. § 5317(c) and 21 U.S.C. § 881(b) respectively.

## MONEY LAUNDERING

7.      Narcotics traffickers amass large cash proceeds from the sale of narcotics in the United States. The traffickers, or those associated with the traffickers, frequently attempt to give the

impression of legitimacy to those proceeds; i.e., to "launder" them by making the proceeds appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

8. In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order both to make their narcotics profits appear to be from legitimate sources and to move those profits through the financial system into the countries where narcotics are produced.

9. A popular method to launder narcotics proceeds is for narcotics traffickers, through a third party, to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug dollars and the legitimate pesos together.

10. In a common BMPE scheme, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China or Panama. The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American

bank.  The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO").  When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds which are located in the United States.

11.  The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur on a street corner or parking lot between two people who have never met before and will most likely never meet again.  These pick-ups frequently involve several hundred thousand dollars in narcotics proceeds.

12.  Following the money pick-up, the BMPE broker arranges to forward those funds to the exporter in the United States.  This is frequently accomplished by remitting those funds directly to the exporter by depositing the narcotics proceeds into accounts held by the exporter.  Frequently, these deposits can be made in different geographical locations, where the DTO is located, rather than transporting illicit dollars to the location where the exporter is located.

## BANK SECRECY ACT

13.  The first step in laundering and/or transporting narcotics proceeds is to deposit the narcotics proceeds in a bank

or financial institution. Once the narcotics proceeds are in a financial institution, they are more easily laundered and transported.

14. The Currency and Foreign Transactions Report Act, 31 U.S.C. § 5313 et seq., also known as the Bank Secrecy Act ("BSA"), is designed to combat money laundering in part by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency.

15. Specifically, pursuant to 31 U.S.C. § 5313(a) and its related regulations, when a domestic financial institution is involved in a transaction for payment, receipt, or transfer of U.S. coins or currency ("cash") in an amount greater than $10,000, the institution shall file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution. CTRs are filed with the Financial Crimes Enforcement Network ("FinCEN") at the Detroit Data Center on forms that require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

16. Many individuals involved in illegal activities, such as narcotics trafficking and money laundering, are aware of the reporting requirements and take active steps to cause financial institutions to fail to file CTRs. These active steps are often

referred to as "structuring." They involve making multiple cash deposits or withdrawals, in amounts less than $10,000, but which in the aggregate exceed $10,000, to multiple banks and/or branches of the same bank on the same day or consecutive days. Structuring is prohibited by 31 U.S.C. § 5234.

17. Finally, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to collect personal identifying information of the customer, similar to that collected for CTRs, and must file that information on a form filed with the IRS. These forms are commonly referred to as "form 8300." Businesses that receive BMPE dollars will frequently fail to file forms 8300 in an attempt to provide anonymity for their customers and the BMPE broker.

## FACTS

18. The Target Accounts are held in the name of Translucent Communications, LLC ("Translucent"), with Brett Schmulian and Paul Greene as signatories.

19. Translucent appears to be an active company in the wholesale business of selling electronics, including the exporting of electronics. According to a Dun and Bradstreet report, Translucent was established in 2004, and has an annual revenue of $4,500,000. According to Florida State records, Translucent was incorporated on December 23, 2004, with Brett Schmulian listed as

the registered agent. The address for Translucent on file with the State of Florida, Suntrust Bank, and Citibank, is 8220 NW 14th Street, Doral Florida. Additionally, a review of bank records show expenditures consistent with a business, including payments to suppliers of electronic equipment.

20. Translucent also maintains an active website (www.translucentcommunications.com). This website lists offices for Translucent at 8220 NW 14th Street, Doral, Florida and in Colombia. The website also identifies Brett Schmulian as President of Translucent.

21. Based on my training and experience and the information described below, I believe Translucent to be in the business of importing and exporting electronics and, at least in part, receiving narcotics money in exchange for it's products. Import/export data for Translucent is consistent with a BMPE scheme involving electronics, in which companies import electronics from China and export them to Colombia, receiving payment through the BMPE. Specifically, records maintained by the Department of Homeland Security show a typical pattern of imports from China to Translucent, believed to be electronics, which are received in the United States, and then exported to locations, primarily Colombia. It is believed that the structured deposits described below are payments for these exports to Colombia.

22. A review of bank records for the Target Citibank Account demonstrates a pattern of structuring activity. A review of the account activity revealed suspicious cash deposits from at least July 17, 2009 through April 12, 2010, which included seventy-one (71) suspicious cash deposits ranging from $507.00 to $9,500.00.

23. The deposits were conducted at thirty five (35) different Citibank branches and included twenty three (23) occasions where two or more deposits were made on the same day at multiple branch locations. Additionally, all of the cash transactions were made in increments under the reportable limits. These deposits were made at multiple financial centers in New York, Illinois, and Florida and total a sum of $345,912.00 (see below chart). **Bold** indicates consecutive day deposits.

| DATE | AMOUNT | DAILY TOTAL | LOCATION |
| --- | --- | --- | --- |
| 07/17/09 | $7,201.00 | $7,201.00 | Englewood, NJ |
| 07/20/09 | $8,302.00 | $15,302.00 | Hackensack, NJ |
| 07/20/09 | $7,000.00 | | Fort Lee, NJ |
| 07/22/09 | $1,188.00 | $1,188.00 | Jackson Heights, NY |
| 08/17/09 | $7,950.00 | $34,145.00 | Ridgewood, NY |
| 08/17/09 | $5,000.00 | | Lake Success, NY |
| 08/17/09 | $5,000.00 | | Hackensack, NJ |
| 08/17/09 | $4,220.00 | | Englewood, NJ |
| 08/17/09 | $3,825.00 | | Long Island City, NY |
| 08/17/09 | $8,150.00 | | Long Island City, NY |
| **08/18/09** | **$8,150.00** | **$8,150.00** | **Ridgewood, NY** |
| 09/03/09 | $9,500.00 | $9,500.00 | Miami, FL |

| Date | Amount | Total | Location |
|---|---|---|---|
| 09/16/09 | $5,000.00 | $5,000.00 | Miami, FL |
| 09/29/09 | $4,860.00 | $11,754.00 | Jackson Heights, NY |
| 09/29/09 | $4,540.00 | | Elmhurst, NY |
| 09/29/09 | $2,154.00 | | Fort Lee, NJ |
| 09/29/09 | $200.00 | | Elmhurst, NY |
| 10/20/09 | $5,420.00 | $10,000.00 | Jackson Heights, NY |
| 10/20/09 | $4,580.00 | | Newark, NJ |
| 10/21/09 | $2,000.00 | $2,507.00 | New York, NY |
| 10/21/09 | $507.00 | | New York, NY |
| 10/22/09 | $4,370.00 | $4,370.00 | Ridgewood, NY |
| 10/23/09 | $4,000.00 | $4,000.00 | Long Island City, NY |
| 11/06/09 | $4,940.00 | $8,940.00 | Chicago, IL |
| 11/06/09 | $4,000.00 | | Chicago, IL |
| 11/12/09 | $5,160.00 | $15,160.00 | Long Island City, NY |
| 11/12/09 | $5,000.00 | | Chicago, IL |
| 11/12/09 | $5,000.00 | | Chicago, IL |
| 11/13/09 | $6,290.00 | $10,400.00 | River Forest, IL |
| 11/13/09 | $4,110.00 | | Bloomingdale, IL |
| 11/17/09 | $3,000.00 | $5,000.00 | Hoffman Estates, IL |
| 11/17/09 | $2,000.00 | | Arlington, IL |
| 11/18/09 | $6,000.00 | $9,000.00 | Chicago, IL |
| 11/18/09 | $1,500.00 | | Northbrook, IL |
| 11/18/09 | $1,500.00 | | Glenview, IL |
| 12/08/09 | $4,320.00 | $4,320.00 | St. Charles, IL |
| 12/09/09 | $5,000.00 | $10,000.00 | Skokie, IL |
| 12/09/09 | $5,000.00 | | Chicago, IL |
| 12/10/09 | $5,000.00 | $10,000.00 | St. Charles, IL |
| 12/10/09 | $5,000.00 | | Chicago, IL |
| 01/06/10 | $5,000.00 | $5,000.00 | New York, NY |
| 01/07/10 | $2,600.00 | $2,600.00 | Jamaica, NY |

10

| Date | Amount | Total | Location |
|---|---|---|---|
| 01/08/10 | $5,000.00 | $5,000.00 | **Jackson Heights, NY** |
| 01/11/10 | $4,000.00 | $6,000.00 | Skokie, IL |
| 01/11/10 | $2,000.00 | | Jackson Heights, NY |
| 01/13/10 | $5,800.00 | $5,800.00 | Hackensack, NJ |
| 11/22/09 | $8,225.00 | $23,045.00 | Larchmont, NY |
| 11/22/09 | $7,980.00 | | New Rochelle, NY |
| 11/22/09 | $6,840.00 | | Scarsdale, NY |
| 01/25/09 | $8,580.00 | $8,580.00 | Flushing, NY |
| 01/29/10 | $4,975.00 | $10,000.00 | Garden City, NY |
| 01/29/10 | $5,025.00 | | Astoria, NY |
| 02/01/10 | $4,890.00 | $10,000.00 | Jackson Heights, NY |
| 02/01/10 | $5,110.00 | | Elmhurst, NY |
| 02/26/10 | $5,000.00 | $5,000.00 | Oakland, IL |
| 03/01/10 | $5,000.00 | $10,000.00 | **St. Charles, IL** |
| 03/01/10 | $5,000.00 | | **Bloomingdale, IL** |
| 03/02/10 | $5,000.00 | $10,000.00 | **Bloomingdale, IL** |
| 03/02/10 | $5,000.00 | | **Oakland, IL** |
| 03/03/10 | $5,000.00 | $5,000.00 | **River Forest, IL** |
| 03/04/10 | $5,050.00 | $10,150.00 | **Bloomingdale, IL** |
| 03/04/10 | $5,100.00 | | **Oakland, IL** |
| 03/12/10 | $5,000.00 | $10,000.00 | St. Charles, IL |
| 03/12/10 | $5,000.00 | | Oakland, IL |
| 03/15/10 | $5,000.00 | $10,800.00 | Chicago, IL |
| 03/15/10 | $5,800.00 | | Skokie, IL |
| 04/08/10 | $4,000.00 | $8,000.00 | St. Charles, IL |
| 04/08/10 | $4,000.00 | | Bloomingdale, IL |
| 04/09/10 | $5,000.00 | $10,000.00 | St. Charles, IL |
| 04/09/10 | $5,000.00 | | Bloomingdale, IL |
| 04/12/10 | $5,000.00 | <u>$5,000.00</u> | St. Charles, IL |
| | Total: | $345,912.00 | |

24. The above deposits were made at multiple bank across four (4) states: New York, New Jersey, Illinois, and Florida. However, there is no indication of Translucent maintaining any business locations or agents in any place other than Florida and Colombia.

25. Additionally, as discussed above, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to file a form 8300 with the IRS. However, despite the cash deposit activity described above, Translucent has not filed any form 8300s with the IRS.

26. A further review of bank records also reveal numerous regular wire transfer of funds from the Target Citibank Account to the Target Suntrust Account. Examples of the wires sent from the Target Citibank Account to the Target Suntrust account are as follows; on December 28, 2009, a wire was sent in the amount of $62,800.00, on January 21, 2010, a wire was sent in the amount of $51,000.00, on March 3, 2010, a wire was sent in the amount of 15,000.00, and on June 2, 2010, a wire was sent in the amount of $15,290.00. This represents only a sampling of the wire activity that is occurring between the Target Accounts.

27. As set forth above, there is probable cause to believe that an amount of funds not to exceed $345,912.00 on deposit in the Target Accounts is subject to seizure and forfeiture as: (a)

property involved in violations of 18 U.S.C. § 1956, and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); (b) property involved in violations of 31 U.S.C. § 5324 and subject to forfeiture pursuant to 31 U.S.C. § 5317; and/or (c) funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. § 881.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
July , 2010

Carmelo Lana
Special Agent
Immigration and Customs Enforcement

Sworn to before me this
___ day of July 2010

S/Bloom

HONORAB
UNITED                                    )GE
EASTERN                                   (